AO 91 (Rev. 11/82)                                    **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>HAMED KABIR and<br>ROHINA SADIQUI | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>**SA 18 - 0 4 2 M** |

Complaint for violation of Title 18, United States Code, Section 371

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE JAY C. GANDHI | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|

| DATE OF OFFENSE<br>02/06/2018 | PLACE OF OFFENSE<br>Orange County | ADDRESS OF ACCUSED (IF KNOWN) | FILED-SOUTHERN DIVISION<br>CLERK, U.S. DISTRICT COURT<br>FEB - 7 2018<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                DEPUTY |
|---|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. § 371]

Beginning on a date unknown, and continuing to on or about February 6, 2018, in Orange County, within the Central District of California, and elsewhere, defendants HAMED KABIR and ROHINA SADIQUI, and others known and unknown, conspired and agreed with each other to knowingly and intentionally transfer or possess a machine gun, in violation of Title 18, United States Code, Section 922(o).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**STACY WIECHEC** /S/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>Jay C. Gandhi | DATE<br>February 7, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA S. Tenley x2829    [REC by AUSA: Detention]

## AFFIDAVIT

I, Stacy Wiechec, being duly sworn, declare and state as follows:

### I. INTRODUCTION

1.    I am a Special Agent with the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), Orange County, California.  I have been so employed since September 2015.  As an HSI Special Agent, I investigate, among other things, illegal narcotics trafficking and gang related offenses.  Prior to joining HSI, I have over fifteen years of federal law enforcement experience through my work as a Special Agent for the U.S. Department of Energy/Office of the Inspector General, the U.S. Postal Inspection Service, and the Food and Drug Administration/Office of Criminal Investigations.  I hold a Bachelor of Arts degree in Political Science minoring in Criminal Justice and a Master of Business Administration.

2.    I have conducted and participated in criminal investigations for violations of federal and state laws including, but not limited to, narcotics trafficking, child exploitation, money laundering, firearms, fraud, and other organized criminal activity.  I have prepared, executed, and assisted with numerous search and arrest warrants.  I have also conducted and participated in many criminal and administrative interviews of suspects and witnesses.  I have also conferred directly with experienced criminal investigators on a variety of topics, including those specializing in the investigation of

1

firearms violations, allowing me to learn from their knowledge and expertise. I have successfully completed several formal law enforcement training academies and courses at the federal, state, and local levels including the Criminal Investigator Training Program and HSI Special Agent Training at the Federal Law Enforcement Training Center ("FLETC") in Glynco, Georgia. During these courses of study, I received specialized training in areas of investigation including, but not limited to, narcotics trafficking, gangs, counter proliferation, child exploitation, cyber-crimes, human smuggling/human trafficking, fraud, and financial investigations. In addition, throughout my federal law enforcement career I have had training and experience with various firearms including handguns, shotguns, and rifles, and have conferred with firearms instructors and other law enforcement agents and officers who are familiar with various firearms and/or who specialize in violations of laws pertaining to firearms.

## II. PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of:

a. A criminal complaint against HAMED KABIR ("KABIR") and ROHINA SADIQUI ("SADIQUI") for a violation of 18 U.S.C. § 371 (conspiracy to transfer or possess a machine gun);

b. A warrant to search a 2013 black Honda Accord, with California license plate 7AXF135 (the "SUBJECT VEHICLE"); and

c.   A Sony laptop computer, located in a drawer in the security guard booth at the main gate of the Turtle Ridge community in Irvine, California (the "SUBJECT DEVICE").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. LOCATIONS TO BE SEARCHED

5.   The SUBJECT VEHICLE is a 2013 black Honda Accord, with California license plate 7AXF135, currently in the custody of Homeland Security Investigation, as further described in Attachment A-1, which is incorporated fully herein by reference.

6.   The SUBJECT DEVICE is a Sony laptop computer, located in a drawer in the security guard booth at the main gate of the Turtle Ridge community in Irvine, California, as further described in Attachment A-2, which is incorporated fully herein by reference.

### IV. STATEMENT OF PROBABLE CAUSE

A.   Background

7.   During this investigation, an undercover HSI agent (the "UC") posed as a firearms vendor on the "darknet."   Based

3

on my communications with HSI Special Agents, including the UC, and my training and experience, I learned the following:

      a.   The darknet generally refers to any overlay network, built on top of the Internet, which can only be accessed using specific software, configurations, browsers, or other protocol beyond direct links. These private networks are purposefully hidden and are designed specifically for anonymity.

      b.   Transactions over the darknet may involve the use of "Bitcoin Cash," a type of digital currency or crypto-currency. Digital currency is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government). Digital currency exists entirely on the Internet and is not stored in any physical form. Digital currency is not illegal in the United States and may be used for legitimate financial transactions.

      c.   Through the darknet, individuals have established online marketplaces or cryptomarkets for narcotics, firearms, and other illegal items. These marketplaces are frequently used by people looking to conduct various criminal activities online in relative secrecy.

    8.   The National Firearms Act, Title 26, United States Code, Section 5845(b), defines as machine gun as follows: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of

the trigger.  The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

      a.   Based on my training and experience, and my conversations with other HSI agents experienced in illicit firearms transactions, I learned that removing the firing pin renders a machine gun inoperable, but that it may be "readily restored" to operating as an automatic weapon by replacing the firing pin.

      b.   I further learned that even without the firing pin, an M4 may still be considered a "machine gun" under § 5845(b) if a part called an  auto sear is installed.  An auto sear is a device that allows the rifle to fire automatically. In fact, even a stand-alone auto sear is considered a "machine gun" under § 5845(b).

**B.**    **Negotiations for the Purchase of a Fully Automatic Machine Gun**

9.    Based on my communications with HSI Special Agents, including an HSI Special Agent acting in an undercover capacity (the "UC"), my review of email communications sent and received by the UC, and my training and experience, I learned the following:

a.   On or around December 20, 2017, an individual using the email address "cedowt@protonmail.com" (the "Target") contacted the UC via encrypted email regarding the purchase of a firearm.

b.   Target first requested a "Carbine, 5.56mm, M4 . . . the same ones used by special forces." Based on my training and experience, I know this to be a semiautomatic rifle. Target asked the UC to send the rifle to California.

c.   On December 22, 2017, after the UC had quoted Target the price of $3,500 for the requested firearm, Target began requesting price quotes for a "high end" M4 rifle. The UC advised Target a "high end" M4 would cost $4,500. The UC also offered the following specifics: "That would be the Colt used by SOF. The usual request is for the 10" barrel with a safe, semi-auto, full-auto trigger pack, not the burst pack found in a standard M4."

i.   "SOF" refers to Special Operations Forces.

ii.   The UC's reference to a "full-auto trigger pack" describes a trigger assembly that has an auto sear incorporated into the firing mechanism as a whole that allows the M4 to function as fully-automatic machine gun.

d.   In a December 23, 2017 email, the UC sent photographs of the M4 rifle he was purporting to offer for sale to the Target. One of the photographs depicted the auto sear, and the UC advised Target, "You can see the auto sear in pic three."

e.    The UC and Target continued to negotiate various details of the transaction via email.  In total, Target sought to purchase the M4 rifle, five magazines, and a magnifying scope (referred to as "optics").  During the negotiations, Target also inquired about purchasing night vision goggles.[1]

f.    On December 24, 2017, when the UC asked Target the destination city for the rifle, Target replied, "It would be sent to Orange County . . . ."  In an email exchange two days later, Target inquired as to whether the UC could ship "worldwide."  Target further specified, "[b]oth long distance and close, and I'm thinking Afghanistan. . . ."  Several hours later, Target also mentioned Dubai as a potential shipping destination for rifles he might potentially purchase from the UC in the future.

g.    After agreeing to a price of $6,000 and viewing photographs of a representative .223 caliber M4 rifle that Target would be purchasing, Target and the UC negotiated the means of payment.  Target and the UC ultimately agreed that Target would provide the UC a $3,000 deposit via Bitcoin Cash (which was ultimately valued at $2,600 by the time the UC collected it based on a decline in the value of Bitcoin Cash on the open market).

---

[1] Target contended that the rifle, optics, magazines, and night vision goggles were for "protection purposes only" because the United States was turning "into a hot political meltdown." He further stated that he foresaw the country "turning south real soon so I'd rather live off grid and pay no taxes somewhere in like Dubai or Afghanistan, realistically speaking would be Dubai for sure."

i.    The UC confirmed to me that the Bitcoin Cash account established for purposes of undercover operations received the deposit from Target on or around January 16, 2018.

h.    Target and the UC also negotiated the means of delivery of the firearm.  Target suggested a number of means of delivery, including leaving the firearm in a public place such as a gym locker or park.  During those conversations, Target expressed that if Target and the UC met in person, Target would need to know that the UC was not law enforcement.  During one email exchange, Target wrote, ". . . I think meeting to have a coffee is sketch on my end and should be for you as well, aren't you afraid one day you may come across [law enforcement] and he happens to be the one buying from you?"

i.    Ultimately, Target and the UC agreed that the UC would leave the firearm in the trunk of an unoccupied vehicle in or around Irvine, California on February 6, 2018 (with the city selected by Target).  After the UC parked the vehicle, the UC would email Target the precise location in Irvine, and provide Target a window within which to pick up the rifle.

j.    On January 29, 2018, Target request a silencer and grip to accompany the rifle purchase.  The UC agreed to provide it and advised Target that the remaining amount due (above the $2,600 deposit) was $4,700.

C.    **Arrest of KABIR and SADIQUI**

10.   Based on my personal participation in the events described below and my conversations with the UC, I learned the following:

a.    The UC was present in Orange County on February 6, 2018.

b.    That afternoon, shortly before 1:00 p.m., HSI agents parked a 1996 Lexus sedan in a shopping center parking lot around the Tustin/Irvine border.  Inside the trunk of the vehicle, agents placed a fully-automatic M4 rifle with the firing pin removed.  The M4 rifle was inside of a duffel bag.

c.    At approximately 1:06 p.m., the UC sent a message to Target's email address informing Target of the location where the Lexus was parked.  The UC further advised Target that Target must pick up the rifle within an hour.

d.    Target never responded.  After around an hour, the UC emailed Target and advised Target that the UC would leave the parking lot.  Law enforcement then coordinated a safe means by which the UC could re-enter the Lexus and leave the parking lot.  This took approximately another hour.

e.    At or around 3:00 p.m., the UC re-entered the Lexus and drove out of the parking lot.  Agents in the parking lot then observed a black Honda sedan (the SUBJECTE VEHICLE) leave the area where the Lexus had been parked at a high rate of speed, proceeding diagonally across the parking lanes.[2]

f.    While in traffic, the UC observed the black Honda sedan behind him.  When the black Honda sedan approached the Lexus in traffic, the UC observed a female in the passenger seat

---

[2] The black Honda sedan is 2013 Honda Accord, with California license plate 7AXF135.  The vehicle is currently impounded and in the custody of Homeland Security Investigations.

9

(later identified as SADIQUI) appearing to wave at, or flag
down, the UC.  For purposes of officer safety, and because the
UC assumed Target now wanted to go through with the deal, the UC
returned to the area of the original parking spot, parked the
Lexus, and walked away (as originally planned)..

       g.    The black Honda sedan pulled into the parking
lot, but no one emerged.  The UC then approached the driver's
side of the black Honda sedan and asked KABIR why he was
following the UC.  KABIR responded that he thought knew he the
UC from high school, but he was mistaken.

       h.    The UC then told KABIR that the UC was looking to
meet someone in the parking lot.  KABIR then confirmed that he
was the person the UC was likely seeking to meet.  KABIR stated
the UC's behavior had caused KABIR to act more cautiously.

       i.    KABIR then provided the UC approximately $4,700
in cash, and asked the UC, using vague language, to put the
rifle in the trunk.  The UC told KABIR that the trunk was full,
and suggested that the UC could put the rifle in the back seat
instead.  KABIR then rolled down the front passenger side
window.  The UC then put the rifle into the passenger
compartment of the car via the front passenger side window
(where SADIQUI was seated).  He also unzipped the rifle case and
partially exposed the rifle so that KABIR and SADIQUI could view
the contents.

       j.    After a brief discussion regarding other
accessories KABIR wanted to order, the UC left the area.

       k.    KABIR and SADIQUI were then arrested.

D. **Post Arrest Interview of KABIR**

11. After his arrest, KABIR waived his <u>Miranda</u> rights and participated in a recorded interview with law enforcement agents.[3] I participated in the interview of KABIR and also reviewed an audio recording of the interview.

a. KABIR admitted that he was in the parking lot for the purpose of purchasing a machine gun. He also described the firearm as an "M4," and "fully automatic." KABIR further stated that he informed SADIQUI that he was planning to purchase the machine gun at or around the time he began negotiating the transaction with the UC over email. KABIR stated that he possess a semiautomatic M4 at his home.

b. KABIR further stated that he communicated with the UC about the firearms transaction via his personal Sony laptop computer. KABIR said he stores the Sony laptop computer at his work. KABIR works at GMI (Guard Management Inc.) and is assigned to the security guard booth at Turtle Ridge development in Irvine, California. The Sony laptop is inside of a drawer in the security guard booth at the main Turtle Ridge gate.

## V. ITEMS TO BE SEIZED

12. Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 18

---

[3] KABIR first invoked his right to counsel, at which time all substantive questioning stopped. Approximately ten minutes later, KABIR advised law enforcement that he wanted to speak with them further. Agents then re-advised KABIR of his Miranda rights via a written advisement. KABIR executed a written waiver of his rights, and then proceeded to make statements to law enforcement.

U.S.C. § 371 (conspiracy) and 18 U.S.C. § 922(o) (transfer or possession of a machine gun), will be found in the SUBJECT VEHICLE and/or the SUBJECT DEVICE.

## VI. CONCLUSION

13.   For all the reasons described above, there is probable cause to believe that KABIR and SADIQUI have committed a violation of 18 U.S.C. § 371 (conspiracy to transfer or possess a machine gun), and to issue warrants to search the SUBJECT VEHICLE and SUBJECT DEVICE.


/S/
_____
STACY WIECHEC, SPECIAL AGENT,
HOMELAND SECURITY
INVESTIGATIONS


Subscribed to and sworn before me
this 7 day of February, 2018

Jay C. Gandhi

_____
HONORABLE JAY C. GANDHI
UNITED STATES MAGISTRATE JUDGE